HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

J.T. et al.,

                        Plaintiff,

            v.

Regence BlueShield et al.,

                        Defendants.

CASE NO. C12-90 RAJ

ORDER

## INTRODUCTION

The court has before it three pending motions.  Dkt. ## 15, 28, 29.  On November 29, 2012, defendants Regence BlueShield and Cambria Health Solutions, Inc., f/k/a The Regence Group ("Defendants") filed a Fed. R. Civ. P. 12(b)(1) motion to dismiss for lack of subject matter jurisdiction.  Dkt. # 15.  Plaintiffs J.T. and S.A. ("Plaintiffs") oppose the motion.  Dkt. # 18.  While that motion was pending, Plaintiff S.A. filed a motion for class certification, as well as a motion for partial summary judgment for declaratory and injunctive relief.  Dkt. ## 28, 29.  Defendants oppose those motions.  Dkt. ## 52-1, 53-1.[1] Having considered the memoranda, exhibits, oral argument, and the record herein, the court DENIES Defendants' motion to dismiss for lack of subject matter jurisdiction (Dkt.

---

[1] Defendants' initial opposition briefs were filed at Dkt. ## 35 and 36.  They subsequently filed corrected briefs.  Dkt. ## 52-1, 53-1.

# 15), DENIES S.A.'s motion for class certification (Dkt. # 28), and DENIES S.A.'s motion for partial summary judgment (Dkt. # 29).

## BACKGROUND

Plaintiffs filed suit on January 17, 2012, alleging that Defendants have failed to comply with Washington's Mental Health Parity Act ("Parity Act"). Dkt. # 1.[2] They contend that the health care plans underwritten by Defendants do not provide coverage for Plaintiffs' medically necessary neurodevelopmental therapy,[3] thus violating the mandates of the Parity Act. Dkt. # 10 (Amended Complaint ("FAC")) ¶¶ 10–16. The Employee Retirement Income Security Act ("ERISA") governs the health care plans at issue, and thus Plaintiffs bring their claims under its provisions. *See* 29 U.S.C. § 1002(1). Plaintiffs' amended complaint sets forth three claims for relief: (1) breach of fiduciary duties pursuant to ERISA § 404(A)(1), 29 U.S.C. § 1104(A); (2) recovery of benefits, clarification of rights under terms of the plan, and clarification of rights to future benefits under the plan pursuant to ERISA § 503(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B); and (3) to enjoin acts and practices in violation of the terms of the plans, to obtain other equitable relief, and to enforce the terms of the plans pursuant to ERISA § 503(a)(3), 29 U.S.C. § 1132(a)(3). Dkt. # 10 ¶¶ 31–44.

## A.   Plaintiff J.T.

J.T., who was 10 years old when Plaintiffs filed this case, is the son of K.T. and R.T. Dkt. # 10 ¶ 1. J.T. is a beneficiary of the Puget Sound Energy, Inc. Health Plan, which was underwritten and administered by Regence BlueShield ("Regence") until December 31, 2011. *Id. ¶¶* 1, 5. J.T. has been diagnosed with Articulation Disorder and Receptive/Expressive Language Disorder, conditions included in the Diagnostic and Statistical Manual of Mental Disorders, 4th Ed. Text Revision ("DSM-IV-TR"). Dkt.

---

[2] S.A. was not named as a plaintiff in the original complaint, but was added to the amended complaint ("FAC") filed March 8, 2012. *See* Dkt. ## 1, 10.

[3] The neurodevelopmental therapies relevant to this case are speech, occupational, and behavioral therapy.

# 21-1 (Ex. A. to K.T. Decl.) at 2.  In 2009 and 2010, J.T. received neurodevelopmental speech therapy to treat these disorders.  Dkt. ## 21 (K.T. Decl.) ¶¶ 2–3; 21-1 at 2, 7 (Exs. A, B to K.T. Decl.).  K.T. and R.T. submitted claims for J.T.'s treatment to Regence, but Regence would not pay for any part of J.T's neurodevelopmental therapy.  Dkt. ## 21 ¶ 3; 21-1 at 9–15 (Ex. C to K.T. Decl.).  Pursuant to the "Neurodevelopmental Therapy Services" provision of J.T.'s plan, neurodevelopmental services (speech, physical, and occupational therapy) are provided only to beneficiaries age six and younger.  Dkt. # 17 at 26 (Ex. A to Garrett Decl.).  K.T. and R.T. appealed Regence's denial of the claims, but on December 10, 2009, they received a letter from Regence stating that J.T. was "not eligible for this coverage because it is limited to children under the age of seven."  Dkt. # 21-1 at 17 (Ex. D to K.T. Decl.).  They again appealed, and Regence responded by reiterating that J.T. was not eligible for coverage due to his age.  Dkt. # 21-1 at 20 (Ex. E to K.T. Decl.).

**B.   Plaintiff S.A.**

S.A. is the daughter of A.K.  Dkt. # 20 (A.K. Decl.) ¶ 2.  She is a beneficiary of the Disability Rights Washington ("DRW") Health Benefit Plan, which is underwritten and administered by Regence.  Dkt. # 10 ¶¶ 2, 5.  She was born with Down Syndrome. Dkt. # 20 ¶ 2.  S.A.'s health care plan provides coverage for neurodevelopmental therapy only to beneficiaries "age six and under with a neurodevelopmental delay."  Dkt. # 17-2 (Ex. D to Garrett Decl.) at 22.  The plan defines "neurodevelopmental delay" as "a delay in normal development that is not related to any documented Illness or Injury."  *Id.* "Illness" is defined as "a congenital malformation that causes functional impairment; a condition, disease, ailment, or bodily disorder."  *Id.* at 74.  S.A.'s plan also provides coverage for rehabilitation services, which are described as "physical, occupational, and speech therapy services . . . necessary to restore or improve lost function caused by Injury or Illness."  *Id.* at 24.  Both benefits place an annual cap on coverage for outpatient services at $1500.  *Id.* at 22, 24.

1    In July 2010, A.K. wrote to Regence and asked whether her health plan would

2    cover speech therapy for her 16-year-old "daughter with Down syndrome." Dkt. # 20-1

3    at 8 (Ex. C to A.K. Decl.).  She received no response.  Dkt. # 20 ¶ 4.  In November 2010,

4    S.A. obtained a "School-Age Speech & Language Evaluation" from the Evergreen

5    Speech & Hearing Clinic ("ESHC").  Dkt. # 20-1 at 2–4 (Ex. A to A.K. Decl.).  Kara

6    Leach, a Speech-Language Pathologist at ESHC, diagnosed S.A. with Developmental

7    Articulation Disorder and Expressive/Receptive Language Disorder, both of which are

8    mental health disorders included in the DSM-IV-TR.[4]  Dkt. # 20-1 at 2.  Leach

9    recommended that "[d]ue to the presence of" these disorders, S.A. should receive "speech

10   and language therapy twice weekly for four to six months depending upon [her] need."

11   Dkt. # 20-1 at 4; *see also id.* at 6 (Ex. B to A.K. Decl.) (medical prescription dated

12   November 26, 2010, for "speech therapy 2x/wk").  On November 22, 2010, "Lisa" from

13   ESHC called Regence customer service to determine whether S.A. had speech therapy

14   benefits available.  Dkt. # 34-1 at 20 (Ex. C to Hamburger Decl.).  Lisa provided the

15   billing codes for Down Syndrome and the two relevant speech disorders.[5]  Dkt. # 34-1 at

16   20.  The customer service representative asked Lisa whether the therapy was "to restore

17   function lost due to illness or injury."  Dkt. # 34-1 at 21.  Lisa responded that "there was

18   no illness or injury," and that "it has to do with the Down's Syndrome."  Dkt. # 34-1 at

19   21.  The representative stated, "So that's considered like neurodevelopmental therapy,"

20   and thus would be covered only up to age six.  Dkt. # 34-1 at 21.  Lisa responded that she

21   "wasn't sure because of the Down's Syndrome diagnosis, if that would fall under the

22   rehab[ilitation] benefit."  Dkt. # 34-1 at 21.  The representative replied, "Yeah, it

23

24

---

25        [4] Defendants dispute that this is a proper diagnosis.  *See* Dkt. # 50 (Stein Decl.) ¶ 4.

26        [5] It appears that Lisa provided the International Classification of Diseases, 9th Revision,
     Clinical Modification ("ICD-9-CM") codes rather than the DSM-IV diagnosis codes, but that the

27   codes she provided correspond with Leach's diagnoses.  *See* Dkt. ## 20-1 at 2; 34-1 at 20; 40-1
     at 7–13 (Ex. 1 to Marisseau Decl.).

1   doesn't." Dkt. # 34-1 at 21.[6]  However, two days later ESHC submitted a claim for the

2   cost of the evaluation to Regence, which Regence paid.  Dkt. # 17-1 at 65–66 (Ex. B to

3   Garrett Decl.).

4        On February 16, 2011, A.K. again wrote to Regence, stating that she had never

5   received a response to her July 2010 letter.  Dkt. # 20-1 at 10 (Ex. D to A.K. Decl.).  She

6   stated that she considered Regence's lack of response to be a denial of her request for

7   speech therapy for S.A., and asked that "Regence reconsider its decision and provide

8   [her] daughter with speech therapy services."  Dkt. # 20-1 at 10.  She enclosed a copy of

9   the ESHC Evaluation, as well as the medical prescription for speech therapy.  Dkt. # 20-1

10  at 10.  Regence responded on February 22, 2011, stating that their "records indicate that

11  there is not an adverse determination at this time,"[7] and thus they were "unable to review

12  the requested appeal."  Dkt. # 20-1 at 12 (Ex. E to A.K. Decl.).  Additionally, they stated

13  that "speech therapy is not subject to pre-authorization."  Dkt. # 20-1 at 12.  However,

14  they went on to explain that pursuant to S.A.'s contract, "benefits will be provided for

15  outpatient rehabilitation services including speech therapy as necessary to restore

16  function lost through [sic] documented illness or injury."  Dkt. # 20-1 at 12.  A.K.

17  believed that S.A.'s therapy was not for the purpose of restoring "lost" function, and that

18  S.A. would therefore not be eligible for coverage under the rehabilitation benefit.  Dkt.

19  # 20 ¶ 4.  However, although the letter invited A.K. to call the customer service

20  department if she needed "any further assistance," and included that department's phone

21  number, A.K. does not allege that she made any attempts to contact Regence to confirm

22  her interpretation of the benefit.  Dkt. # 20-1 at 12.  A.K. could not afford to pay for

23  S.A.'s treatment out-of-pocket, and thus S.A. received no speech therapy.  Dkt. # 20 ¶ 5.

24

25

26        [6] S.A. does not allege that A.K. was aware that this conversation took place.

27        [7] Regence contends that it did not receive the July 2010 letter until A.K. sent a copy of it
      with her February 2011 letter.  Dkt. # 17 at 3 ¶ 8 (Garrett Decl.).

1  **ANALYSIS**

2  **A.  Parity Act**

3  Prior to 2005, no Washington state law mandated that insurance providers include

4  coverage for mental health services in their health benefit plans.  *See* Dkt. # 19-1 at 137

5  (S.B. Rep., S.H.B. 1154 (Wash. 2005)).  The legislature addressed this lack of coverage

6  in the Parity Act, finding that "the costs of leaving mental disorders untreated or

7  undertreated are significant," and that "it is not cost-effective to treat persons with mental

8  disorders differently than persons with medical and surgical disorders."  *See* Dkt. # 19-1

9  at 104–05 (S.H.B. 1154, 59th Leg., 2005 Reg. Sess. (Wash. 2005)).  The Parity Act's

10  objective was to achieve coverage for mental health services "under the same terms and

11  conditions as medical and surgical services."  *See id.* at 105.  The Parity Act defines

12  "mental health services" as "medically necessary outpatient and inpatient services

13  provided to treat mental disorders covered by the diagnostic categories listed in the most

14  current version of the diagnostic and statistical manual of mental disorders."  RCW

15  48.44.341(1).  The Act sets forth a five-year, three-phase implementation process.  *See*

16  RCW 48.44.341(2)(a)–(c).[8]

17  The first phase of the Act, applicable to health benefit plans "delivered, issued for

18  delivery, or renewed on or after January 1, 2006," required that "[a]ll health service

19  contracts providing health benefit plans that provide coverage for medical and surgical

20  services shall provide . . . [m]ental health services."  RCW 48.44.341(2)(a)(i).

21  Additionally, the copayment for such services could be no greater than the copayment for

22  medical or surgical services, and the plans were required to cover prescription drugs to

23

24  _____

[8] The Parity Act's requirements apply to five types of insurance plans: plans administered
25  by the Washington State Health Care Authority, plans provided by disability insurers, plans
provided by health care services contractors, plans provided by health maintenance
26  organizations, and benefits provided by the Washington Basic Health Plan.  Dkt. # 19-1 at 141
(Final H.R. B. Rep., S.H.B. 1154 (Wash. 2005)).  RCW 48.44 relates to plans provided by health
27  care service contractors, the type of plan at issue here.

1  treat mental health disorders to the same extent and under the same terms and conditions

2  as other covered prescription drugs.  RCW 48.44.341(2)(a)(i)–(ii).

3         Phase two, applicable to health plans delivered, issued, or renewed on or after

4  January 1, 2008, incorporated the mandates of phase one and added the requirement that

5  any health benefit plan that imposed a maximum out-of-pocket limit or stop loss must

6  impose a single limit or stop loss for medical, surgical, and mental health services.  RCW

7  48.44.341(2)(b)(i).

8         The final phase, applicable to plans delivered, issued, or renewed on or after July

9  1, 2010, incorporates the mandates of the previous two phases and adds the condition that

10  that any deductible requirement include mental health, medical, and surgical services.

11  Additionally, this phase adds the provision that "[t]reatment limitations or any other

12  financial requirements on coverage for mental health services are only allowed if the

13  same limitations or requirements are imposed on coverage for medical and surgical

14  services."  RCW 48.44.341(2)(c)(i).

15  **B.     Subject Matter Jurisdiction – Fed. R. Civ. P. 12(b)(1)**

16         A challenge to subject matter jurisdiction may be either facial or factual.  *Savage*

17  *v. Glendale Union High School*, 343 F.3d 1036, 1040 n.2 (9th Cir. 2003); *see also* Fed. R.

18  Civ. P. 12(b)(1).  In a facial challenge, the moving party contends that, even accepting all

19  of the allegations in the plaintiff's complaint as true, the plaintiff has failed to establish

20  that the court has jurisdiction over the claims.  *See Safe Air for Everyone v. Meyer*, 373

21  F.3d 1035, 1039 (9th Cir. 2004).  In a factual challenge, however, the moving party may

22  submit affidavits or other evidence disputing the allegations in the complaint that

23  purportedly provide the basis for jurisdiction.  *See id.*  The nonmoving party must then

24  present evidence sufficient to meet its burden of establishing subject matter jurisdiction.

25  *See id.*  A court may consider evidence outside the complaint without converting a Rule

26  12(b)(1) motion into a motion for summary judgment.  *Id.*  However, just as in a motion

27

ORDER- 7

1  for summary judgment, all disputes of fact will be resolved in favor of the non-movant.

2  *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1997).

3      1.  <u>J.T.</u>

4      Defendants argue that this court lacks subject matter jurisdiction over J.T.'s claims

5  because J.T.'s health plan was not delivered, issued, or renewed on or after July 1, 2010.

6  *See* Dkt. # 15 at 1–2.  They contend that Regence's policy of limiting coverage for

7  neurodevelopmental therapy to patients age six and younger constitutes an age-based

8  "treatment limitation," and that treatment limitations were permitted until the third phase

9  of the Parity Act went into effect.  Dkt. # 15 at 4.  Thus, they conclude that J.T. "was not

10 denied benefits under a plan that was subject to the Parity Act's treatment limitations

11 mandate."  Dkt. # 15 at 6.  Plaintiffs dispute Defendants' characterization of the age-

12 based restriction on neurodevelopmental therapy, arguing that it constitutes an exclusion

13 from coverage rather than a treatment limitation.  Dkt. # 18 at 19.  They contend that such

14 exclusions have been impermissible since the inception of the Parity Act in 2006.  Dkt.

15 # 18 at 19.

16     Defendants rely in part on *Z.D. v. Group Health*, Case No. C11-1119-RSL, 2012

17 WL 1997705 (W.D. Wash. June 1, 2012), which involved a challenge to an age-based

18 restriction on neurodevelopmental therapy similar to the one at issue here.  Defendants

19 assert that the *Z.D.* court considered the treatment limitation/exclusion issue and

20 "concluded that the limitation of neurodevelopmental therapies to beneficiaries six and

21 younger was a 'treatment limitation' of the kind contemplated in the third phase of the

22 Parity Act."  Dkt. # 15 at 4.  However, although the *Z.D.* court referred to the age-based

23 restriction as a "treatment limitation" in its June 1st order, there is no indication that the

24 court "concluded" that this was the proper characterization of the restriction, given that

25 the issue was not presented to that court.  *See generally Z.D.*, 2012 WL 1997705 (June 1,

26 2012, Order).  Moreover, in the *Z.D.* court's order of October 17, 2012, the court called

27 the age-based restriction an exclusion and found that it had been impermissible since the

1  first phase of the Parity Act.  2012 WL 5033422, *8 (W.D. Wash. Oct. 17, 2012).  The

2  court held that "*since January 1, 2006*, Group Health breached its fiduciary duties when

3  it failed to abide by the requirements of the Mental Health Parity Act and *excluded*

4  *coverage* for medically necessary neurodevelopmental therapies to persons age seven and

5  older with covered DSM-IV conditions." *Id.* (emphasis added).  The *Z.D.* court did not

6  consider whether an age-based restriction on coverage should be construed as a treatment

7  limitation or an exclusion.  This question is presently before this court.

8      A court's objective in interpreting a statute is to effectuate the legislature's intent.

9  *See Bostain v. Food Exp., Inc.*, 159 Wn.2d 700, 708 (2007).  Where the meaning of a

10 statute is plain on its face, the court considers that meaning to be the expression of that

11 intent.  *Id.*  To determine the plain meaning of a statute, the court looks to "the ordinary

12 meaning of the language used in the context of the entire statute in which the particular

13 provision is found, related statutory provisions, and the statutory scheme as a whole."  *Id.*

14 If after such analysis the statute is subject to more than one reasonable interpretation, the

15 court will turn to an examination of the legislative history and principles of statutory

16 construction.  *Id.* at 708–09.

17     The clause at issue here states that "[t]reatment limitations or any other financial

18 requirements on coverage for mental health services are only allowed if the same

19 limitations or requirements are imposed on coverage for medical and surgical services[.]"

20 *See* RCW 48.44.341(2)(c)(i).  The use of the phrasing "*other* financial requirements"

21 indicates that "treatment limitations" are a type of financial requirement, such as

22 monetary caps on benefits.  Additionally, the inclusion of the phrase "on coverage"

23 presumes that coverage exists, which is consistent with the original mandate of the Parity

24 Act to provide coverage.  *See* RCW 48.44.341(2)(a)(i).  Reading RCW 48.44.341 as a

25 whole indicates that although the coverage mandate originated in phase one, it was

26 permissible to impose certain financial limits or requirements on that coverage until full

27

1   parity was achieved in phase three.  What was not permissible in phase one was to

2   completely exclude coverage for an entire class of beneficiaries.

3         The provision in J.T.'s health plan regarding neurodevelopmental therapy services

4   states that "[t]he benefits described below will be provided for the treatment of

5   neurodevelopmental delay when treatment is performed for the purpose of restoring and

6   improving function for children age six and under."  Dkt. # 17 at 26.  This provision

7   necessarily means neurodevelopmental therapy will <u>not</u> be provided for beneficiaries age

8   seven and over.  *See id.*  Dr. Richard Rainey, executive medical director for Regence and

9   Defendants' Fed. R. Civ. P. 30(b)(6) witness, confirmed that Regence "follows its

10  contract language and *excludes* care for individuals that are over the age of six for

11  neurodevelopmental therapies."  Dkt. # 19-1 at 6 (Rainey Dep. at 18:6–11) (emphasis

12  added); *id.* at 3 (6:19–7:1), 4 (10:18–11:3); *see also id.* at 8 (27:11–20), 14 (49:18–

13  50:10).  J.T.'s health plan did not merely limit the coverage available to him for his

14  medically necessary speech therapy; it provided him with no coverage whatsoever.  J.T.

15  thus has standing to pursue his claims against Defendants.[9]

16        2.  <u>S.A.</u>

17        Defendants contend that S.A. has not established a redressable injury causally

18  connected to Defendants' actions, and thus does not have constitutional standing to bring

19  her claims.  They cite the fact that Regence paid the only claim that S.A. submitted, and

20  the fact that they have repeatedly indicated that S.A. is eligible for coverage under the

21  rehabilitation benefit.  Dkt. # 15 at 15.  Preliminarily, the court notes that the relief that

22  S.A. seeks, and thus her underlying arguments, have been something of a moving target.

23  Initially, it appeared that S.A. sought only to abolish the age restriction contained in the

24  neurodevelopmental therapy benefit.  The letters that A.K. sent to Regence inquired only

25

26        [9] Defendants also argued in their motion to dismiss that J.T. does not have standing to
    pursue prospective relief because he is no longer insured by Regence.  Dkt. # 15 at 2.  However,
27  Plaintiffs have since clarified that J.T. is seeking only retrospective relief.  Dkt. # 18 at 8 n.3.

1    about the age restriction, and in S.A.'s response to Defendants' motion to dismiss she

2    focused on the imminent harm she faced due to the fact that she "is over age six, [and]

3    currently needs neurodevelopmental therapies." Dkt. ## 18 at 23; 20-1 at 8, 10.  In her

4    motion for class certification, S.A. identified the "single overriding question of law" as

5    "[whether] Regence's exclusion of neurodevelopmental therapies for its insureds over the

6    age of six . . . violate[s] the Mental Health Parity Act." Dkt. # 28 at 12.  Yet on the next

7    page of her motion, she stated that she was seeking "declaratory and injunctive relief that

8    Regence must cover her medically necessary neurodevelopmental therapies under its

9    mental health benefit," which is a different benefit entirely from the neurodevelopmental

10   therapy benefit and contains no age restrictions.[10]  *Id.* at 13; Dkt. # 17-2 at 22.  Then, in

11   her motion for partial summary judgment, she requested that the court "declare that

12   Regence's denial of neurodevelopmental therapies to treat individuals over the age of

13   seven violate[s] the terms of the ERISA plan it insures," but went on to argue that the

14   court should order Regence to cover neurodevelopmental therapies "under its mental

15   health benefit." Dkt. # 29 at 20–21.  In her reply in support of that motion, she contended

16   that "[t]he important question is *not* whether S.A.'s speech therapy is classified as

17   'neurodevelopmental therapy' or 'rehabilitation,'" but rather "whether it is classified as a

18   'mental health service.'" Dkt. # 42 at 7 (emphasis in original).  Finally, at oral argument

19   S.A. conceded that her need for speech therapy is related to her Down Syndrome (which

20   constitutes an "illness" pursuant to the DRW plan), and thus she would not be entitled to

21   coverage under the neurodevelopmental therapy benefit regardless of her age.  Thus, the

22

23

---

24        [10] The mental health services benefit "cover[s] Mental Health Services for treatment of
     Mental Health Conditions," which it defines as "Mental Disorders in the most recent edition of
25   the Diagnostic and Statistical Manual of Mental Disorders." Dkt. # 17-2 at 22.  It defines
     "mental health services" to include "Medically Necessary outpatient services." *Id.*  The benefit
26   does not contain an annual monetary cap on coverage like the neurodevelopmental therapy or
     rehabilitation benefits do.  *Id.* at 22, 24.
27

1  only relief she now seeks relates to coverage under the mental health services benefit.

2  The court therefore considers whether S.A. has standing to pursue this relief.[11]

3        Just like any other plaintiff, a plaintiff bringing an ERISA claim must have

4  standing pursuant to Article III of the United States Constitution.  *Paulsen et al. v. CNF,*

5  *Inc., et al.*, 559 F.3d 1061, 1072 (9th Cir. 2009).  To have standing under Article III, a

6  plaintiff must demonstrate that (1) she has suffered an actual or threatened injury in fact;

7  (2) the injury is causally connected to the conduct complained of; and (3) it is likely, and

8  not merely speculative, that her injury will be redressed by a favorable decision.  *Lujan v.*

9  *Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

10  a.   First Claim for Relief – ERISA § 404(A)(1)

11        A beneficiary of an ERISA-governed plan may bring an action against a fiduciary

12  of that plan.  29 U.S.C. §§ 1109, 1132(a)(2).  A fiduciary who breaches his duties "shall

13  be personally liable to make good to such plan any losses to the plan resulting from each

14  such breach, and to restore to such plan any profits of such fiduciary which have been

15  made through use of assets of the plan by the fiduciary, and shall be subject to such other

16  equitable or remedial relief as the court may deem appropriate."  29 U.S.C. § 1109(a).

17  Any relief sought for a breach of fiduciary duty must benefit the plan, rather than its

18  participants or beneficiaries.  *See Mass. Mut. Life. Ins. Co. v. Russell*, 473 U.S. 134, 144

19  (1985) ("Congress did not intend that section to authorize any relief except for the plan

20

21

22        [11] Defendants pointed out at oral argument that S.A's contentions regarding coverage
    under the mental health services benefit is a new argument that was not expressly identified in
23  the complaint.  Defendants' point is well taken, and the court is well aware of the evolving
    nature of S.A's arguments thus far.  However, the court finds that although S.A. did not
24  expressly raise this particular issue in the FAC, the FAC did give Defendants sufficient notice
    that Plaintiffs would challenge Regence's "policies or practices that wholly exclude or
25  impermissibly limit services to treat conditions listed in the DSM-IV-TR, including
    neurodevelopmental and behavioral therapies."  Dkt. # 10 at 13 ¶ 3.  S.A.'s current argument that
26  neurodevelopmental therapies to treat DSM-IV conditions must be covered under the mental
    health services benefit in order to comply with the Parity Act falls under this umbrella.
27

1    itself."). Defendants contend that S.A. does not have constitutional standing to bring this

2    claim because she has not suffered any injury. Dkt. # 22 at 11.

3         Again, S.A.'s arguments supporting her claim have evolved over the course of this

4    litigation. In the FAC, S.A. stated that she seeks "recovery of all losses to the Plans,

5    including (but not limited to) relief compelling Regence to restore to the Plans all losses

6    (including interest) arising from Regence's breaches of fiduciary duties." Dkt. # 10 ¶ 38.

7    In her demand for relief, she requested that the court "[e]nter judgment on behalf of the

8    Plans, plaintiffs and the class for losses sustained by such Plans due to Regence's

9    breaches of fiduciary duties." Dkt. # 10 at 13 ¶ 2. Yet, S.A. has not alleged that the plan

10   in fact suffered any losses. However, in her response to Defendants' motion to dismiss,

11   S.A. argued that remedies are available even where a plan has suffered no losses, and

12   that, as a beneficiary of the plan, she has standing to pursue "injunctive relief that would

13   permit her to finally receive the neurodevelopmental therapy she requires." Dkt. # 18 at

14   27. She cited the alleged breach as Defendants' issuance of "policies that purported to

15   exclude neurodevelopmental therapies for insureds over six." Dkt. # 18 at 27. Then, in

16   her motion for summary judgment, she stated that she seeks, pursuant to the "equitable

17   and remedial relief" provision of § 502(a)(2), "a permanent injunction (a) precluding

18   Regence from denying neurodevelopmental therapy benefits to treat individuals with

19   DSM-IV-TR mental health conditions because they are over the age of six; and (b)

20   requiring that Regence cover neurodevelopmental mental health services under its mental

21   health benefit." Dkt. # 29 at 22–24. But then, in her reply in support of that motion, S.A.

22   asserted that she "is not seeking the payment of benefits under [§ 502(a)(2)]," but that she

23   is invoking this provision merely "to enjoin Regence from issuing plans with illegal and

24   misleading plan terms." Dkt. # 42 at 14. The court will thus consider whether she has

25   standing to pursue this particular relief.

26        Regence is a fiduciary under ERISA. *See Aetna Health Inc. v. Davila*, 542 U.S.

27   200, 218–19 (2004) ("A benefit determination under ERISA . . . is generally a fiduciary

ORDER- 13

act.").  "[A] fiduciary shall discharge his duties with respect to a plan solely in the

interest of the participants and beneficiaries."  29 U.S.C. § 1104(a)(1).  A fiduciary has a

duty to provide accurate information to plan participants and beneficiaries "at all times."

*See Wayne v. Pacific Bell*, 238 F.3d 1048, 1055 (9th Cir. 1999).  This Circuit holds that

"[u]nder 29 U.S.C. § 1104(a) . . . an ERISA plaintiff may prosecute a plan fiduciary who

fails to perform for the exclusive benefit of participants and their beneficiaries regardless

of cost or loss to the participants and their beneficiaries."  *Ziegler v. Conn. Gen. Life Ins.

Co.*, 916 F.2d 548, 551 (9th Cir. 1990).  A plaintiff may not seek a monetary remedy in

the absence of a loss, but she may still seek equitable relief.  *See Shaver v. Operating

Engineers Local 428 Pension Trust Fund*, 332 F.3d 1198, 1203 (9th Cir. 2003); *see also

Wells v. California Physicians' Serv.*, Case No. C-05-01229-CRB, 2007 WL 926490, *4

(N.D. Cal. Mar. 26, 2007) ("Although some courts have held that an ERISA plaintiff

must allege individual loss or injury to have Article III standing, they require such a

showing only where plaintiffs seek monetary relief.").  To the extent that S.A. seeks only

to enjoin Defendants from disseminating allegedly erroneous information, she seeks an

equitable, non-monetary remedy that does not require a showing of an individual loss or

injury.  As a plan beneficiary, she thus has standing to pursue this remedy.

b.    Second Claim for Relief – ERISA § 502(a)(1)(B)

        Pursuant to ERISA § 502(a)(1)(B), a beneficiary of an ERISA-governed plan may

bring an action "to recover benefits due to him under the terms of his plan, to enforce his

rights under the terms of the plan, or to clarify his rights to future benefits under the terms

of the plan."  29 U.S.C. § 1132(a)(1)(B).  Defendants contend that S.A. does not have

constitutional standing to bring this claim, arguing that she cannot establish injury,

causation, or redressability as required by Article III.  Insofar as S.A. is challenging the

age exclusion in the neurodevelopmental therapy benefit, Defendants are correct.  S.A.

has not demonstrated that she has a redressable injury, given her concession that her

speech therapy would not be covered by the neurodevelopmental therapy benefit

1   regardless of her age.  However, to the extent that S.A. alleges that any treatments for

2   DSM-IV conditions must be covered under the mental health services benefit in order to

3   comply with the Parity Act, she meets the Article III standing requirements.

4         The requisite injury-in-fact pursuant to Article III must be actual or threatened,

5   and not merely speculative.  *See Lujan*, 504 U.S. at 560.  Here, S.A. has provided

6   evidence that she has been diagnosed with DSM-IV mental disorders, that she has been

7   prescribed a course of speech therapy to treat those disorders, and that the cost of her

8   course of treatment will exceed $1500 dollars.  Dkt. ## 20 ¶ 5; 20-1 at 2, 4.  Thus, she

9   contends, the harm she faces is lack of coverage for her treatment.  *See* Dkt. # 18 at 22.

10   Defendants argue that whether S.A. will ever reach the $1500 cap is purely speculative,

11   given that she has not sought any therapy in the two-and-a-half years since her treatment

12   was prescribed.

13         Under the circumstances of this case, the court finds that S.A.'s lack of action is

14   not evidence that she is disinterested in treatment or that the harm she faces is purely

15   speculative.  The prescribed course of therapy requires sessions two times per week for

16   four to six months, and A.K. has stated that she cannot afford this expense until she has

17   assurances that Regence will reimburse her.  Dkt. ## 20 ¶ 5; 20-1 at 4.  Due to the

18   frequency of the therapy, A.K. stands to incur the costs of several of S.A.'s sessions

19   before Regence could even consider her claims.  The injury that S.A. faces is thus not

20   purely hypothetical or speculative.

21         S.A. also meets Article III's causation and redressability requirements.  She

22   alleges that Defendants' practice of covering neurodevelopmental therapies to treat DSM-

23   IV conditions under plan provisions other than the mental health services benefit violates

24   the Parity Act, and that this violation impedes her access to medically necessary

25   treatments.  She contends than an order from this court requiring Defendants to provide

26   coverage for her therapies under the mental health services benefit will redress this

27

injury.  Without commenting on the merits of these contentions, the court finds that they are sufficient to establish Article III standing.

c.   Third Claim for Relief – ERISA § 502(a)(3)

An ERISA beneficiary may also seek equitable relief via 29 U.S.C. § 1132(a)(3), and S.A. has done so here.  Again, Defendants contend that S.A. has not suffered an injury sufficient to confer Article III standing.  *See* Dkt. # 22 at 11–12.  However, for all of the reasons set forth above, the court finds that she has sufficiently established the requisites to pursue equitable relief as allowed by this provision.

**C.  Class Certification**

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'"  *Comcast Corp. et al. v. Behrend et al.*, ___ U.S. ___, 133 S. Ct. 1426, 1432 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)).  Thus, the court must perform a "rigorous analysis" in determining whether to certify a class.  *Wal-Mart Stores, Inc. v. Dukes, et al.*, ___ U.S. ___, 131 S. Ct. 2541, 2551 (2011) (citations omitted).  As part of this analysis, the court "*must* consider the merits [of the substantive claims] if they overlap with [the class certification] requirements."  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) (emphasis in original); *see also Comcast*, 133 S. Ct. at 1432.

A plaintiff seeking class certification has the burden of demonstrating that the proposed class meets each of the requisite elements of Fed. R. Civ. P. 23 ("Rule 23").  First, the party must demonstrate that each of the elements of Rule 23(a) are present: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a); *see also Ellis*, 657 F.3d at 979–80.  Once the plaintiff has demonstrated that

1    each of these elements are present, she must then prove that at least one of the three

2    prongs of Rule 23(b) is satisfied.  Fed. R. Civ. P. 23(b); *Comcast*, 133 S. Ct. at 1432.[12]

3          Numerosity is satisfied where joinder would be impracticable.  *Smith v. Univ. of*

4    *Wash. Law Sch.*, 2 F. Supp. 2d 1324, 1340 (W.D. Wash. 1998).  Here, S.A. has put forth

5    evidence estimating that the potential class would number in the tens of thousands.  *See*

6    Dkt. # 33 (Fox Decl.) ¶ 9.  Defendants do not dispute this evidence, nor do they offer any

7    other argument regarding numerosity.  The court therefore finds that S.A. has met the

8    numerosity requirement.

9          The typicality requirement of Rule 23(a) ensures that the interests of the named

10   plaintiff align with those of the class.  Fed. R. Civ. P. 23(a)(3); *Hanon v. Dataproducts*

11   *Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  To determine whether the named plaintiff's

12   claims are typical, the court analyzes "whether other members have the same or similar

13   injury, whether the action is based on conduct which is not unique to the named

14   plaintiffs, and whether other class members have been injured by the same course of

15   conduct."  *Hanon*, 976 F.2d at 508 (citation omitted).  If a class representative's claims

16   are subject to unique defenses that threaten to attract the focus of the litigation, class

17   certification is inappropriate.  *Id.*

18         Here, S.A.'s claims are not typical.  She has been diagnosed with Down

19   Syndrome, and, as illustrated above, this diagnosis has implications for her claims.  S.A.

20   has conceded that she is not eligible for the DRW plan's neurodevelopmental therapy

21   benefit (regardless of her age), which renders her without standing to challenge the age

22   restriction contained therein.  Additionally, S.A. and Defendants dispute whether S.A.

23

24         [12] Defendants argue that, as a threshold requirement, the Plaintiffs must demonstrate that
25   the class they seek to certify is "ascertainable."  Dkt. # 52-1 at 6–7.  However, Defendants cite
     no Ninth Circuit authority for this proposition, nor is the court aware of any.  Although some
26   other circuits and lower courts have imposed an "ascertainability" requirement, the court
     believes that this concept is encompassed within the prerequisites in Rule 23 and does not
27   require a separate analysis.

1   has even been properly diagnosed with a DSM-IV mental disorder.  *Compare* Dkt. ## 20-

2   1 at 2, *with* 50 ¶ 4.  S.A.'s claims are thus not typical of potential class members who

3   have only DSM-IV diagnoses, or are otherwise undisputedly eligible for coverage under

4   the neurodevelopmental therapy benefit but are excluded due to age.

5        To meet the commonality requirement, a plaintiff must demonstrate that "there are

6   questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  The Supreme

7   Court has explained that this requirement is better understood as an inquiry into "'the

8   capacity of a classwide proceeding to generate common *answers* apt to drive the

9   resolution of the litigation.'"  *Wal-Mart Stores v. Dukes*, ___ U.S. ___, 131 S. Ct. 2541,

10  2551 (2011) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate*

11  *Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009) (emphasis in original)).

12       In her motion for class certification, S.A. presented the common question as:

13  "Does Regence's exclusion of neurodevelopmental therapies for its insureds over the age

14  of six with DSM-IV-TR mental conditions violate the Mental Health Parity Act?"  Dkt.

15  # 28 at 12.  Yet, as discussed above, the resolution of this question is not applicable to

16  S.A. (and thus not common to her), given that she is ineligible for that benefit regardless

17  of her age.  In her reply in support of her motion for class certification, S.A. presented a

18  new version of the common question: "Must Regence provide coverage for speech,

19  occupational, and physical therapies for insureds with DSM-IV mental health conditions

20  under its mental health benefit?"  Dkt. # 41 at 10.  While this iteration of the question

21  may indeed present an issue that is common to both S.A. and the potential class members,

22  the fact that S.A. revamped the common question midstream illustrates a further problem

23  with her request for certification: adequacy of representation insofar as it relates to her

24  ability to prosecute the interests of the entire class.

25       The adequacy requirement under Rule 23(a) has two components: (1) whether any

26  conflicts of interests exist between plaintiffs and their counsel and other class members,

27  and (2) whether plaintiffs and their counsel will vigorously prosecute the action on behalf

ORDER- 18

1  of the class members.  Fed. R. Civ. P. 23(a)(4); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011,

2  1020 (9th Cir. 1998).  While the court has no hesitation with regard to the abilities of

3  counsel, the court is not convinced that S.A. is a proper representative.  The morphing

4  that S.A.'s requested relief and arguments have undergone in an apparent attempt to

5  account for her particular situation raises concerns for the court regarding her ability to

6  adequately represent and vigorously prosecute the interests of the class as a whole.  Thus,

7  for all of the foregoing reasons, the court DENIES S.A.'s motion to certify the class.[13]

8  **D.   Partial Summary Judgment – Declaratory and Injunctive Relief**

9          Summary judgment is appropriate where no genuine issue of material fact exists

10  and judgment is appropriate as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party

11  has the initial burden of proving each element of her claims or defenses and that no

12  genuine issue of fact exists.  *Celotex Corp v. Catrett*, 477 U.S. 317, 323–24 (1986.  If she

13  meets this burden, the non-movant must then present rebuttal evidence demonstrating that

14  a material dispute is, in fact, present, and that summary judgment is thus not warranted.

15  *Celotex*, 477 U.S. at 324.  The court may not weigh the evidence or make credibility

16  determinations, and must draw all reasonable inferences in favor of the non-movant.

17  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  A court may grant

18  a permanent injunction on summary judgment so long as there are no issues of material

19  fact relevant to whether injunctive relief is proper.  *See S.E.C. v. Murphy*, 626 F.2d 633,

20  655 (9th Cir. 1980).

21          In her motion for partial summary judgment, S.A. asks this court to clarify the

22  rights of S.A. and the class by (1) enjoining Regence from applying its

23  neurodevelopmental therapy exclusions for persons over the age of six; (2) ordering

24  Defendants to cover neurodevelopmental therapies to treat DSM-IV conditions under the

25

26          [13] Plaintiffs contend that another potential class member, B.S., could substitute in as class
representative if this court has concerns about S.A.  Dkt. # 28 at 15 n.3.  However, they have
27  presented no motion on that issue and thus the court declines to address substitution at this time.

1    "mental health services" benefit; and (3) ordering immediate corrective notice to class

2    members and reformation of Defendants' ERISA plan documents.  Dkt. # 29 at 8–9, 29.

3            1.   Neurodevelopmental Therapy Exclusion

4            Citing 29 U.S.C. 1132 (a)(1)(B), S.A. first asks this court to "declare that Regence

5    may not exclude medically necessary neurodevelopmental therapies to treat DSM-IV-TR

6    conditions for individuals in its insured ERISA plans, such as S.A., based on the

7    insured's age." Dkt. # 29 at 21.  However, as the court explained above, S.A. has

8    conceded that her speech therapy would not be covered under this benefit even if it

9    contained no age restriction, and thus she does not have a redressable injury.  S.A.

10   therefore may not contest the neurodevelopmental therapy provision.

11           2.   Coverage Under the Mental Health Services Benefit

12           Next, S.A. asks this court to order Defendants to cover neurodevelopmental

13   therapies to treat DSM-IV conditions under the "mental health services" benefit.  Dkt.

14   # 29 at 21.  She contends that when neurodevelopmental therapy services are prescribed

15   to treat mental health disorders, such therapies are considered "mental health services"

16   and thus must be covered under the mental health services benefit.  Dkt. # 42 at 7–9.

17   There are no age limits or annual monetary caps for services provided under that benefit,

18   whereas both the neurodevelopmental therapy benefit and the rehabilitation benefit cap

19   annual services at $1500.  Dkt. # 17-2 at 22, 24.  S.A. argues that the Parity Act prohibits

20   such a cap when services are provided to treat a DSM-IV condition, and thus such

21   services must be provided under the limitless mental health services benefit.  Dkt. # 42 at

22   8.  S.A. concedes that the remedy she seeks "would result in more favorable coverage for

23   persons with DSM-IV conditions than for those without the conditions," but argues that

24   this is "*exactly* what the Legislature intended."  Dkt. # 59 at 5 (emphasis in original).

25           S.A. states that she is entitled to summary judgment on this issue because "[i]t is

26   undisputed that [her] recommended speech therapy is designed to treat her DSM-IV-TR

27   mental health conditions."  Dkt. # 42 at 8.  However, S.A.'s contention that this is

"undisputed" is incorrect.  Defendants have presented evidence disputing S.A.'s expert, and calling her DSM-IV diagnoses into question.  Dkt. # 50 (Stein Decl.) ¶¶ 4, 6.  S.A. is thus not entitled to judgment as a matter of law.

Even if this issue were undisputed, the court finds the recent rulings in this District and in King County Superior Court persuasive.  The *Z.D.* court and the King County Superior Court recently considered and rejected similar arguments regarding limitations on neurodevelopmental therapies.  *Z.D.*, 2013 WL 1412388 (Apr. 8, 2013); Dkt. # 62-1 (*O.S.T. et al. v. Regence BlueShield*, Case No. 11-2-34187-9 SEA (King Co. Sup. Ct. Apr. 17, 2013)).  In *Z.D.*, the plaintiffs challenged defendant Group Health's practice of "lumping" all rehabilitative and neurodevelopmental therapies together, and "capping" them at a limit of 60 visits per year.  *Z.D.*, 2013 WL 1412388, at *1.  The plaintiffs alleged that this "lump and cap" procedure violated the Parity Act because it improperly imposed a limit on neurodevelopmental therapies prescribed to treat mental health disorders.  Plaintiffs argued that "only treatment limitations or financial limitations imposed on all medical and surgical benefits, broadly defined, may be applied to services obtained to treat a mental health condition."  *Id.* at *2.

The court rejected this argument, finding that what the plaintiffs were asking for was "more than parity."  *Id.*  The court held that "the therapies covered under Group Health's rehabilitation benefit—occupational, physical, and speech therapies—are exactly the same therapies Plaintiffs want covered when medically necessary to treat mental disorders," and thus "in this case, where Group Health has a specific benefit addressing the exact therapies for which Plaintiffs seek coverage, that benefit is not too narrow a comparator."  *Id.*  The court ultimately held that Group Health's visit limits on neurodevelopmental therapies did not violate the Parity Act.  *Id.* at *3.

In *O.S.T.*, the court considered the propriety of annual monetary caps on neurodevelopmental therapy services.  Dkt. # 62-1 at 2 (*O.S.T.* at 2).  The court followed the *Z.D.* court's reasoning and concluded that "Regence's cap on neurodevelopmental

therapies to treat mental health disorders is allowed under the [Parity] Act because Regence applies the exact same cap on coverage to those therapies when used to treat physical health conditions." Dkt. # 62-1 at 5 (*O.S.T.* at 5).

Here, S.A. contends that the issue of treatment limits is not before this court, and that "[w]hether Regence might attempt to impose such limits under its contracts is an issue for another day." Dkt. # 59 at 3.  However, the result that she seeks (a court order requiring Regence to provide coverage under its limitless mental health services benefit) necessarily invokes the same principles at issue before the *Z.D.* and *O.S.T.* courts.  This court finds their reasoning persuasive.  The Parity Act requires parity.  It does not require that persons seeking treatment for DSM-IV conditions be treated more favorably than persons seeking treatment for physical conditions.

The court DENIES S.A.'s motion for partial summary judgment.[14]

## CONCLUSION

For all of the foregoing reasons, the court finds as follows:

(1)  The court DENIES Defendants' motion to dismiss for lack of subject matter jurisdiction.

(2)  The court DENIES Plaintiff S.A.'s motion to certify the class.

(3)  The court DENIES Plaintiff S.A.'s motion for partial summary judgment.


Dated this 4th day of June, 2013.


The Honorable Richard A. Jones
United States District Judge

---

[14] The court notes that Defendants have made numerous representations regarding S.A.'s eligibility for coverage under the rehabilitation benefit.  The court thus expects that, should S.A. pursue coverage under this benefit, she will not encounter any problems in doing so.

ORDER- 22